López Vilanova, Juez Ponente
*1173 TEXTO COMPLETO DE LA SENTENCIA
Reynaldo Montalvo López recurre de la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Aguadilla, quien, luego de que un jurado le encontrara culpable de los delitos de Robo e Infracción a la Ley de Armas, le impuso la pena de separación permanente. Con el beneficio de los alegatos de las partes, la exposición narrativa estipulada y los autos originales procedemos a resolver.
I
El Ministerio Público presentó cargos contra el apelante por los delitos de Robo e Infracción a los Artículos 5, 6, 8 y 8 (A) de la Ley de Armas. Se imputó que, actuando en concierto y común acuerdo con otras tres personas, mediante fuerza y utilizando armas de fuego, se apropiaron de $50,000.00 en efectivo de una caja fuerte en la inmediata presencia de su dueño Miguel Acevedo. El robo se cometió estando vestidos como policías.
Los cargos se imputaron en grado de reincidencia habitual. De la acusación surgen sentencias finales y firmes de varios delitos de Robo, Escalamiento Agravado e Infracción a la Ley de Armas.
El juicio se celebró ante jurado conjuntamente contra los acusados Domingo Mercado Mercado, Efraín Montalvo Mercado, y el apelante Reynaldo Montalvo López.
El Principal testigo de cargo lo fue Noel Casas Ramírez, un co-autor con inmunidad. El testimonio de éste, conforme surge de la Exposición estipulada fue el siguiente:

“Declaró el Sr. Noel Casas Ramírez que tiene 32 años de edad y reside en el pueblo de San Sebastián, Puerto Rico. Que para la fecha del 15 de marzo del año 2000, se presentaron a una ferretería del Poblado San Antonio de Aguadilla. Que junto a él se encontraba Mingo, a quien identificó en corte abierta como el del “sueter blanco” y el más gordo de todos los co-acusados y que se llama Domingo Mercado Mercado (el del medio de la pared hacia acá). Continúa declarando que también los acompañaban Frank (el primero de la pared hacia acá) y Reynaldo (el tercero de la pared hacia acá) que son hermanos y otro más que no estaba en sala, de nombre Cuquí que era el chofer. Que se dirigieron hacia esa ferretería de Bobby Chan, en San Antonio, para efectuar un asalto. Que llegaron allí vestidos de policía. Reynaldo tenía puesto un jacket con las letras del F.B.I., Domingo llevaba una identificación como una cadenita de las que usa la policía. Que el (Noel Casas Ramírez) llevaba un jacket con letras azules que decían Policía de Puerto Rico.

Que llegaron allí en un vehículo de cuatro puertas grande de color azul oscuro, qu.e Cuquí manejaba el vehículo y Mingo iba de pasajero al frente. Los otros tres íbamos atrás yo, Frank y Rey.

Que dos días antes del asalto, él y Mingo habían hablado sobre el asalto y fueron a comprar dos libras de clavos para familiarizarse con la ferretería. Que el día del asalto llegaron al lugar y se bajaron, primero Mingo y él (Noel Casas Ramírez). Que él preguntó al empleado que ¿dónde estaba el dueño? Que en esos momentos salió el dueño y ellos (él y Mingo) se identificaron como Policías, que pareció como que el dueño 
*1174
sospechó algo y nosotros sacamos las armas; Mingo sacó una 9mm y yo una escopeta recortada. Que la escopeta recortada era color negra y la 9mm era niquelada.

Que Mingo le dijo que fuera a buscar a Rey y salió Frank y se quedraron con el dueño del local en su oficina (Mingo y Frank). Yo me fui con Rey y cogimos al empleado y lo llevamos al baño. Y Rey se quedó con el empleado velándolo en el baño (lo dejópega'o, vigilándolo con el arma).

Que esto ocurrió de 11:00 am a 11 y pico del día.

Mientras esto ocurría, yo me quede en la puerta del local, parado, para ver que no viniera nadie. Mingo y Frank metieron el dinero en un bulto porque ellos eran los que estaban en la oficina con el dueño. El dinero se echó en unos bultos negros y se sacó de una bóveda mientras yo vigilaba la puerta, le di la escopeta recortada a Rey y Frank tenía una escopeta larga color negra.

Que este Robo lo planificó Domingo Mercado, porque él fue el que me lo dijo a mi y me fue a buscar. Yo le conté esto a una muchacha que vivía conmigo para ese tiempo, ella me dijo que no lo hiciera y yo le dije que no lo iba hacer. Ella se llama Mayra González. (Que está como testigo del Ministerio Público).

Cuando salimos de la ferretería, de regreso en dirección a la Base, Domingo me dió un cantazo con la escopeta y me dijo “mira como son las cosas de preso”.

(E.N.E. págs. 2 y 3).
La defensa de “Domingo Mercado, licenciado Crespo, presentó objeción. ” “El Juez retiró al Jurado de sala”. El licenciado Crespo [abogado del co-acusado] objetó que se mencione que su cliente estuvo preso”. (Véase minuta del 8 de mayo de 2001 de los autos originales).
La exposición estipulada recoge que la objeción se fundamentó en que era impropio que el testigo “declarara que estuvo preso con los acusados, porque eso llevaba a la mente del jurado que tenían convicciones anteriores.” Se argumentó además que, aun cuando fuere pertinente, causa más daño, por lo que debe ser excluida. Añadió “que hay otras formas de probar de dónde se conocen el testigo y los acusados. La argumentación del fiscal ante el juez fue que la realidad es que el testigo “lo conoce [a Domingo] de cuando estuvieron presos” Que esto “está así en la declaración jurada que se le tomó [al testigo], ”
La defensa del aquí apelante argumentó sobre el caso Pueblo v. Hernández Pérez, 94 D.P.R. 616 (1967), donde se trajo a la atención del jurado convicciones anteriores.
El Tribunal declaró no ha lugar el planteamiento de la defensa y el testigo continuó su examen directo.
De regreso a sala declaró que “conoce a Domingo de preso, a Frank de la calle y de preso, [al apelante] Reynaldo de la calle y de preso y que en una ocasión se fugaron juntos.” Ello fue objetado. 
El resto del testimonio del testigo con inmunidad fue el siguiente:

“Continúa Noel Casas Ramírez declarando que en el viaje de regreso, iba Cuquí de chofer y Frank al frente, los demás íbamos atrás.

Fue entonces cuando Mingo me dijo, mira como son las cosas de preso y me dió con la escopeta y me bajaron del carro y se fueron con los chavos. ”

*1175
A preguntas del Fiscal sobre ¿qué usted quiere decir con problemas de preso? Hubo objeción de la defensa y el Honorable Tribunal la declaró NO HA LUGAR¡ Noel Casas Ramírez contestó que cuando estuvieron presos a Mingo le dieron una pela y el decía que era yo (Noel Casas Ramírez) el que los había enviado. Eso . sucedió en la Cárcel de Guerrero.

Que fue cerca del Nuevo San Antonio, donde hay una antena bien grande, donde lo dejaron a pie.

A preguntas del Fiscal sobre la procedencia de las armas, el testigo relata que el día antes del asalto las alquilaron en San Sebastián, él (Noel Casas Ramírez), Reynaldo y Frank las alquilaron en el Sector Pueblo Nuevo de San Sebastián a Juan. Que el negocio era, como otras veces, que se le iba a dar un por ciento a Juan de lo que se recogiera. Que sólo alquilaron las escopetas porque la pistola era de Mingo. ”

Aquí termina el directo del Fiscal a Noel Casas Ramírez.
CONTRAINTERROGATORIO DE NOEL CASAS RAMIREZ POR LA DEFENSA:

“El testigo Noel Casas Ramírez declaró que estaba acusado por estos mismos delitos, pero que su caso todavía estaba pendiente de juicio. Y que una vez él declarara en estos casos, le iba a archivar los casos que hay en contra de él como parte del contrato de inmunidad. Noel Casas Ramírez contestó a preguntas de la defensa de dónde vivía antes del Robo y contestó en el Hogar Crea. Se le preguntó porqué estaba en Hogar Crea y contestó que llegó hay de la cárcel. Se le preguntó ¿sifué por drogas? Y dijo que no, que el abandonó el Hogar Crea.

Que allá para el 15 de marzo de 2000 y antes del 15 de abril de 2000, que es cuando lo regresan a la cárcel, no dijo nada a nadie sobre estos hechos. Que no fue hasta Julio de 2000 que su compañera lo pone en contacto con la Policía, porque él tiene información sobre unos delitos. ”

(Págs. 5,6,7 de la exposición estipulada).
El resto de la prueba de cargo consistió en los testimonios de Wilfredo-Agront, Miguel Acevedo y el agente Waldemar Valle. Su testimonio fue, en síntesis, el siguiente:

“Wilfredo Agront Torres declaró, en síntesis, que trabaja en San Antonio Aluminum y su jefe es Miguel Acevedo. El día de los hechos comenzó a trabajar a las 8:00 de la mañana y a eso de las 10:30 a 11:00 de la mañana llegó un auto gris y se bajaron dos individuos con identificación de policía y preguntaron por su jefe que es conocido por Bobby Chan. El les indicó que estaba allí y le preguntaron a su jefe si tenía armas. Luego se fueron a hablar en privado. Identificó a esos dos individuos como el testigo de caso, Noel Casa fRamírez y el co-acusado Domingo Mercado quien tenía una identificación en el cuello como de policía. Indicó que Noel Casas Ramírez lo encerró en el baño, después encierran al jefe con él. Atestó que al rato abren la puerta del baño, sacan a su jefe y le preguntaron por una caja. Indicó que más tarde abrieron la puerta del baño y vio que tiraron un bulto y de él sacaron dos armas, una escopeta recortada y una larga. El que tiró el bulto fue el individuo con un jacket del FBI. Escuchó que alguien dijo: abre la caja o te matamos. Testificó que Noel Casas le dice: “no me mires y quédate tranquilo ”. Testificó que cerraron la puerta y más tarde su jefe la abrió. Observó que este último estaba amarrado y le dijo: “suéltame que nos asaltaron ”. Declaró que todo esto duró de quince (15) a veinte (20) minutos y que el robo pudo haber comenzado a las 11:00 y terminado a las 11:20 de la mañana.

En contrainterrogatorio declaró que no vió al apelante el día del asalto y no lo podía identificar como uno de los asaltantes. En el redirecto indicó que el asalto pudo haber terminado a eso de las 11:20 y comenzado a eso de las 11:00 de la mañana.

*1176
Miguel Acevedo declaró, en esencia, que es comerciante y dueño de la Ferretería. El día de los hechos estaba en su negocio y a eso de las 10:30 a 11:00 de la mañana entró un individuo, a quien identificó como el co-acusado Domingo Mercado, vestido de policía y con identificación y le preguntó a su empleado por él. Dijo que tenía que hablar en privado don él y le preguntó si tenía alguna arma. Fueron detrás del negocio y el co-acusado Mercado, quien tenía una identificación de la Policía con una cadenita en el cuello, le indicó que era un asalto. Luego lo llevó al baño y lo metió allí con su empleado Wilfredo Agront. Entró a la oficina, cogió su cartera y después lo sacó del baño y le dijo que abriera la caja fuerte. Ahí, Noel Casas, apuntándole con una escopeta, le dice que abra la caja. Abrió la caja y luego lo amarran con cinta adhesiva plástica. Indicó que lo dejaron encerrado en el cuarto con la caja y como a los cinco (5) minutos miró y como no vio a nadie fue al baño y buscó a su empleado Wilfredo. Atestó que el asalto duró unos veinte (20) a veinticinco (25) minutos y que se llevaron cincuenta mil dólares ($50,000). El testigo declaró que en adición a Domingo Mercado y Noel Casas, vio a una tercera persona que tenía un jacket del FBI, pero no le vió la cara. En el contrainterrogatorio declaró que los hechos ocurrieron de 10:30 a 11:00 am. Indicó que los asaltantes no tenían máscaras para cubrir sus rostros. Que el incidente duró de veinte (20) a veinticinco (25) minutos y durante ese tiempo lo movieron de un sitio a otro. Indicó que no puede identificar al apelante como una de las personas que cometió el asalto.

El agente Waldemar Valle declaró, en síntesis, que el caso de epígrafe le fue asignado tres (3) días luego de los hechos. Fue al lugar de los hechos y entrevistó a Miguel Acevedo y a su empleado Wilfredo Agront. Testificó que los perjudicados le describieron a los asaltantes. Miguel Acevedo le narró que un individuo fuerte, blanco, y de 5'5” a 5'7” y con un "badge” de policía preguntó por Bobby, se identificó como policía y pidió hablar en privado con él. Pasaron a la parte de atrás del negocio y allí éste le anunció que era un asalto. Ese individuo regresó al interior del negocio con el perjudicado y llegó otro individuo delgado con bigote tipo candado que le apuntó con una escopeta. Lo encerraron en el baño junto a su empleado Wilfredo Agront, lo sacan y preguntan por la bóveda. El perjudicado los llevó hasta la bóveda. Le indicó que entró un tercer individuo, flaco, como de 57”, al cual no se le vió el rostro, vistiendo un jacket azul con letras del FBI que trajo unos bultos negros donde echaron el dinero. Lo amarraron con unos "straps ” plásticos y lo encerraron en el baño. Al entrevistar al empleado Wilfredo Agront, éste le confirmó lo relatado por Miguel Acevedo. Concluyó, como parte de su investigación, que los asaltantes se marcharon en un vehículo Grand Marquis color azul metálico. Inició una investigación, pero no encontró nada hasta que en el mes de junio llegó una señora llamada Mayra González, quien pidió hablar con el Sargento Valentín y les informó que Noel Casas, quien convivía con ella y estaba preso, quería dar una información sobre unos asesinatos. Indicó que trajeron a Noel Casas de la cárcel y él les dio una información sobre unos asesinatos ocurridos en Aguadillo y Aguada. Declaró que la información sobre los asesinatos eran rumores, nada sólido. Atestó que Noel también les informó que él participó en un robo en la Ferretería de San Antonio junto a Mingo, Rey, Frank y Cuqui, el chofer. Indicó que Noel Casas le narró que Domingo Mercado planeó el robo. Los perjudicados indicaron que Mercado fue el primero en entrar y se hizo pasar por policía. Como parte de su investigación, atestó que hizo un “line-up ” de fotos, entre las que se encontraba una de Noel Casas y los perjudicados lo identificarán positivamente. También lo identificaron personalmente en el cuartel. Declaró que por medio de confidencias logró ocupar el vehículo utilizado para cometer los delitos. Testificó que colocó el vehículo ocupado entre otros en el estacionamiento de la ferretería y Noel Casas lo identificó como el que se usó el día de los hechos.

En contrainterrogatorio declaró que se sometieron los casos en ausencia contra Domingo Mercado, el apelante, Efraín Montalvo López y Noel Casas Ramírez. Este último fue excarcelado para cooperar con relación a unos asesinatos a cambio de una recomendación del Fiscal para salir de la cárcel. Nunca había visto ni conocido a Noel Casas. La información sobre los asesinatos no pudo ser corroborada, pero el robo sí se pudo corroborar. Atestó que no prestó declaración jurada relacionada con estos hechos y todo lo declarado sobre lo sucedido el 15 de marzo de 2000, es por investigación.

Indicó que los perjudicados no puedieron identificar a nadie con relación al robo cuando al inicio de la *1177 investigación se le mostraron unos libros de fotografías. Luego los identificaron, ya que tenía a Noel Casas como testigo y tenían fotos de los demás en los expedientes.”
El apelante no presentó prueba de defensa. 
El apelante no solicitó instrucciones especiales al jurado. La exposición no recoge que instrucciones se ofrecieron.
Con la prueba antes expuesta, el jurado absolvió al apelante en dos (2) cargos de Infracción a los Art. 5 y 6 de la Ley de Armas. Le encontró culpable, por mayoría, en los restantes, así como en el cargo de Robo. 
En su recurso, el apelante imputa la comisión de los siguientes errores:

“A. Erró el Tribunal de Primera Instancia al permitir al Ministerio Público interrogar :aT testigo con inmunidad total sobre las convicciones anteriores del apelante en forma lesiva, con el supuesto propósito de que éste declarara de dónde se conocían y al no instruir al jurado sobre el propósito con el cual admitió esa línea de interrogatorio.

B. Erró el Honorable Tribunal de Instancia al admitir evidencia testifical, a pesar de la oportuna y correcta objeción del apelante.

C. Erró el Honorable Tribunal al aceptar el veredicto de culpabilidad cuando el jurado se equivocó en la aplicación de la Ley, ya que no se probó la culpabilidad del apelante más allá de duda razonable.

D. Erró el Honorable Tribunal al aceptar un veredicto defectuoso y al no instruir al jurado para que reconsidere dicho veredicto. ” (Enfasis nuestro)
Examinemos los mismos.
II
En el planteamiento de error primero y segundo se cuestiona el incidente surgido cuando prestaba testimonio el testigo con inmunidad. De entrada, es menester señalar que, contrario a lo alegado, el testigo no habló de convicción anterior alguna. Tampoco hizo alusión a los casos por los cuales fue anteriormente sentenciado el apelante. Tampoco declaró que hubiere cometido junto a él delito alguno previo al caso ante nos.
Lo que sí declaró fue que “conoció a Domingo de preso” y “al apelante lo conoce de la calle y de preso” cuando se fugaron juntos.
De la exposición narrativa, surge que el co-autor está narrando lo ocurrido después del robo cuando van todos los co-autores en el automóvil. “Mingo [refiriéndose al co-autor Domingo] le dijo, mira como son las cosas de preso. Le dió con la escopeta y “me bajaron del carro, se fueron con los chavos y me dejaron a pie ”,
Ajuicio del apelante, lo anterior constituye “prueba de convicción anteriorNo estamos de acuerdo.
En el caso de epígrafe no se aludió a convicción anterior alguna ni a la naturaleza del delito. La Regla 68 de Procedimiento Criminal dispone, en lo pertinente que:

“Cuando la acusación imputare un delito en grado de reincidencia o subsiguiente o delincuencia habitual, el acusado podrá, al momento de hacer alegación, o en cualquier ocasión posterior, siempre que fuere antes de leerse la acusación al jurado, admitir la convicción o convicciones anteriores y, en tal caso, no se hará saber 
*1178
al jurado en forma alguna la existencia de dicha convicción o convicciones. ”

De acuerdo a los hechos estipulados, mientras el fiscal interrogaba al testigo principal de cargo, un coautor con inmunidad, éste indicó que conoció al apelante mientras estuvieron presos. La admisión, de dicha prueba no iba dirigida a traer a la atención del jurado que el apelante fue convicto anteriormente, sino para probar que el apelante conocía al testigo y por tal razón lo buscó para cometer los hechos delictivos. Dicha prueba es pertinente para otros propósitos. La Regla 20 (B) de Evidencia indica lo siguiente:
‘‘Aunque evidencia de la comisión de otros delitos, daño civil u otros actos no es admisible para probar el carácter de una persona, con miras a demostrar que actuó de conformidad con tal carácter, dicha evidencia es admisible si es pertinente para otros propósitos, tales como prueba de motivo, oportunidad, intención, preparación, plan, conocimiento, identidad o ausencia de error o accidente(Enfasis suplido)
La anterior disposición exige al proponente de la evidencia de otros delitos o actos distintos al que se está juzgando, que vincule esos otros actos con un aspecto significativo de lo que se está juzgando, como por ejemplo, el motivo, plan o intención. El proponente debe entonces poder fundamentar que esta prueba es pertinente para establecer un hecho importante en controversia y que su valor probatorio es sustancialmente mayor que su efecto perjudicial contra el acusado. Chiesa, Práctica Procesal Puertorriqueña. Evidencia, Publicaciones J.T.S., Vol. I, 1979, págs. 78-79. US v. Blankenship, 775 F.2d 735 (1985).
Al aplicar lo antes discutido a la situación de hechos que nos ocupa, es forzoso concluir que no erró el foro recurrido de primera instancia al admitir en el caso de epígrafe la prueba sobre la manera en que el co-acusado y el apelante se conocieron. Dicha prueba era admisible para demostrar el motivo, plan, preparación, conocimiento y ausencia de error o accidente en la comisión del delito. El apelante cita el caso de Pueblo v. Galindo González, 129 D.P.R. 627 (1991), como apoyo a su contención. Dicho caso es totalmente distinguible al de autos. Allí, el acusado se encontraba declarando y el fiscal hizo referencia en cinco (5) ocasiones, durante el contrainterrogatorio, a una convicción anterior de éste, con la objeción de la defensa y ante el jurado. El fiscal hizo referencia a la fecha de la convicción y a la naturaleza del delito.
De otra parte, aun cuando se considerara que el Tribunal no debió permitir la manifestación en controversia dicho error, por sí sólo no conlleva la revocación. Sabido es que el criterio para determinar si un error en materia de evidencia acarrea revocación, es determinar si, de no haberse cometido el error, probablemente el resultado hubiera sido distinto. Pueblo v. Mangual Hernández, 111 D.P.R. 136 (1981); Pueblo v. Rosaly Soto, 128 D.P.R. 729 (1991); Pueblo v. Mendoza Lozada, 120 D.P.R. 815 (1988).
La Regla 4 de las Reglas de Evidencia dispone:

“No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia, a menos que:

1. La evidencia fue erróneamente admitida, a pesar de la oportuna y correcta objeción de la parte perjudicada por la admisión, y

2. el tribunal que considera el efecto de la admisión errónea entiende que ésta fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita. ”
La parte que sufre un error en admisión o exclusión errónea de evidencia en violación a derechos bajo la Constitución de los Estados Unidos o la Constitución del Estado Libre Asociado de Puerto Rico no ha de prevalecer en apelación o revocación si ajuicio del Tribunal Apelativo el resultado hubiera sido el mismo de no haberse cometido el error. Chiesa, op. cit., Chapman v. California, 386 U.S. 18 (1966): Pueblo v. Ramos *1179 Alvarez, 118 D.P.R. 82 (1987).
En el caso ante nos, la prueba de cargo ubicó al apelante en el lugar que se cometió el delito y su participación fue activa.
III
Como tercer señalamiento de error, el apelante plantea que no se probó su caso más allá de duda razonable. Apoya su posición en que Noel Casas Ramírez, co-autor y testigo con inmunidad, lo involucra con los hechos, por lo que este testigo debe verse con sospecha. Añade que el jurado erróneamente decidió condenar a tres de los co-acusados, por lo que tuvo que decidir entre Frank y el apelante. Este último argumento es especulativo. Sabido es, además, que la declaración positiva de un testigo de cargo es suficiente por sí sola, si es creída por el juzgador, para sostener una convicción, pues ha sido norma reiterada del Tribunal Supremo que la evidencia directa de un testigo que merezca crédito es prueba suficiente de cualquier hecho. Regla 10 (D) de Evidencia. Este principio básico de suficiencia de pmeba ha sido reiterado en los casos de Pueblo v. Rodríguez Román, supra, y Pueblo v. Chévere Heredia, 139 D.P.R. 1, (1995).
El hecho de que se le haya concedido inmunidad o mejor trato a un coautor, no lo descalifica como testigo; corresponde al juzgador examinar con cuidado y cautela su testimonio y decidir si es digno de credibilidad. Pueblo v. Falcón Negrón, 126 D.P.R. 75 (1990; Pueblo v. Echevarría Rodríguez, supra; Pueblo v. Torres Rivera, 129 D.P.R. 331 (1991).
Dicho testigo declaró que el día de los hechos, él llevaba una chaqueta con letras azules que decían “Policía de Puerto Rico”; el co-acusado Domingo Mercado, quien viajaba de pasajero al frente del vehículo, llevaba una identificación “como una cadenita de las que usa la policía” y el apelante llevaba una chaqueta con las letras FBI. Indicó que los primeros en entrar a la Ferretería fueron Mingo (Domingo Mercado) y él. Luego el testigo fue a buscar al apelante. E.E.P. págs 2-3. El testigo Wilfred© Agront Torres declaró que al negocio llegó un automóvil gris de donde se bajaron dos individuos vestidos de policía”. Indicó que “el que se bajo del frente... tenía una identificación en el cuello como de policía”. Atestó que “otro que llegó con un jacket azul del FBI” tiró un bulto. E.E:P: pág. 7. Miguel Acevedo Román atestó que el co-autor Domingo Mercado tenía una identificación de la policía “con una cadenita en el cuello” y vió a una tercera persona que tenía una chaqueta del FBI E.E.P. págs. 9 y 10. El Agente Valle entrevistó a los perjudicados y éstos le indicaron que el co-autor Domingo Mercado entró primero a la Ferretería y se hizo pasar por policía. Ese co-acusado llevó al perjudicado Acevedo a la parte de atrás del negocio. E.E.P. pág 14. Los perjudicados le indicaron que “entró un tercer individuo al cual no se le ve el rostro, pero tiene un jacket azul con letras del FBI y trae unos bultos negros”. E. E.P. pág. 11.
El apelante fue positiva y claramente ubicado en la escena del delito por el co-autor y testigo de cargo, quien lo conocía antes de ocurrir los hechos. Los perjudicados declararon sobre tres asaltantes y uno de ellos vestía una chaqueta con las letras del FBI. La totalidad de las circunstancias particulares de este caso hacen de la identificación del apelante una confiable.
El argumento del apelante de que el foro incidió al no impartir instrucciones específicas y al aceptar el veredicto, carece de méritos. El Apelante no solicitó ninguna instrucción especial. Tampoco trae ante nos qué instrucciones fueron impartidas, por lo que no nos coloca en posición de resolver dicho reclamo.
El jurado escuchó la prueba de cargo, analizó la misma, salió a sala en dos (2) ocasiones, pidió escuchar testimonios adicionales y después de aquilatar la prueba a la luz de la credibilidad que le mereció, absolvió al apelante en dos cargos y lo condenó en los restantes.
En ausencia de pasión, prejuicio o error manifiesto, no intervendremos con dicha apreciación.
*1180 Con estos antecedentes, se confirma la sentencia recurrida.
Notifíquese.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2002 DTA 78
1. Obsérvese que el testigo hasta ese momento estaba hablando sólo del co-acusado Domingo.
2. La minuta que obra en los autos originales no recoge esta objeción.
3. El co-acusado Domingo Mercado presentó la defensa de coartada.
4. El co-acusado Efrain Montalvo fue absuelto en todos los cargos por unanimidad. El co-acusado Domingo Mercado fue declarado culpable y absuelto en los mismos cargos que el apelante.